## McILVAINE PATENT CORPORATION v. WALGREEN CO. et al.

### No. 2754.

District Court, N. D. Illinois, E. D.

April 4, 1942.

Robert L. Kahn and Max R. Kraus, both of Chicago, Ill., for plaintiff.

Zabel, Carlson, Gritzbaugh & Wells, (Max W. Zabel, Greek Wells, and Edward U. Dithmar, all of Chicago, Ill.), for defendants.

BARNES, District Judge.

This is an action at law by the plaintiff, McIlvaine Patent Corporation, which is the owner of McIlvaine Patent No. 2,-040,753, issued May 12, 1936, on an application filed February 3, 1930, and of McIlvaine Patent No. 2,060,584, issued November 10, 1936, on an application filed July 16, 1930, against the defendants, Walgreen Co. and Acme-Wiley Signs, Incorporated, for damages for alleged infringement of Claim 5 of Patent No. 2,040,753 and Claim 1 of Patent No. 2,060,584.

The case was tried before the court and a jury. The defendants moved for a directed verdict at the close of the plaintiff's case and again at the close of all the evidence. The court reserved ruling on each motion. The jury returned special verdicts, finding: That both claims were valid; that both were infringed by two devices of the defendants; that the inventions of both claims were made in the year 1927; that the defendants were notified of the infringement of Patent No. 2,060,584 prior to April 13, 1940; that the plaintiff was damaged $2,500 by reason of the infringement of Claim 5; and that it was damaged $2,500 by reason of the infringement of Claim 1. The plaintiff moved for judgment on the verdicts, and the defendants moved for judgment notwithstanding the verdicts and for a new trial.

Patent No. 2,040,753 says:

"This invention relates to electric ray-producing devices * * *. Another object of the invention is the provision of means for reducing the tendency of metallic arcs or gas-discharge apparatus to blacken the container walls by sputtering. * * * When a current is applied to such a lamp the glowing filament soon ionizes the gas to the point where an independent discharge begins to take place between the electrodes * * *.

"Such an intense positive-column discharge always tends to produce what is known as 'sputtering' of the electrodes with consequent blackening of the container-walls. I have found that the employment of coiled tungsten wire is of peculiar advantage in preventing this since the mechanically-treated and drawn wire has a greater density than other forms of the metal, and because such hollow electrode carries most of its discharge on the interior, thereby confining the sputtering to the inside of the electrode, and preventing or at least retarding the blackening of the globe or container. The advantages of the hollow electrode can of course be enjoyed without making the electrode of coiled wire. In Fig. 4 I have shown the electrodes as consisting of pressed cups 12-12 of tungsten carried by the wires 6 and 7 and facing each other.

"The very great intensity of the discharge however causes it to tend to overrun onto the exterior of these electrodes and to oppose and diminish this tendency I preferably surround each electrode with a spaced insulated wire coil 13 parallel and more or less accurately concentric therewith, although the latter point is of comparatively small importance within wide limits. Preferably these coils 13-13 are spaced entirely apart and insulated, a separate coil for each electrode. In Fig. 1 I have shown these coils as sealed to a glass header 14 carried by the leading-in wires. In Fig. 5 I have shown them as carried by a glass header 15 sealed in the press. The operation of these coils depends upon the fact that insulated metallic bodies of this nature, located inside such a container, tend to pick up stray electrons until a considerable charge is accumulated, and this charge exhibits the phenomenon of repelling the cathode glow and causing

it to confine itself inside the electrodes, at least throughout a much larger range of current-densities than otherwise. This arrangement effectually prevents or retards the blacking of the bulb interior."

Claim 5 of this patent is as follows: "5. Apparatus for producing electric light comprising a closed container which is transparent to the rays desired, a pair of spaced hollow metallic bodies located inside said container having open ends turned toward each other, metallic leading-in wires connected to said bodies, a readily ionizable gas at subatmospheric pressure in said container, and electrostatic shields surrounding said bodies and spaced therefrom and positioned within the container to receive and maintain a negative charge whereby the cathode glow is confined inside said electrodes."

Patent No. 2,060,584 says:

"This invention relates to electric lights and has for its broadest aspect the provision of means for preventing blackening of the bulb walls or at least of so directing and controlling the discharged particles as to cause certain areas of the glass to remain clear. This branch of the invention is applicable alike to filament lamps and to lamps which derive a part of their light from gas-arcs or positive column glow. * * * This application is a continuation in part of my prior application Serial No. 425,455, filed February 3, 1930. * * * When a current is applied to such a lamp the glowing filament soon ionizes the gas to the point where an independent discharge begins to take place between the electrodes 10-10 resulting in a great increase in the amount of light produced, this light also proving very rich in ultra-violet and actinic rays. * * *

"Such an intense positive-column discharge always tends to produce what is known as 'sputtering' of the electrodes with consequent blackening of the container-walls. This sputtering can be reduced to some extent by proper choice of the shape and material of the electrodes for example by making the same cup-shaped and hollow as shown at 12 in Figs. 4 and 5, the open mouth of the cups being presented towards each other. It is still better to make these electrodes of coiled tungsten wire, closely wound into helix form as shown at 12a in Fig. 3 since the mechanically treated and drawn wire has a greater density than other forms of the metal. In both forms of electrode the major portion of the discharge comes from the interior, thereby confining the sputtering to some extent and preventing or at least retarding the blackening of the bulb.

"The very great intensity of the discharge however causes it to tend to overrun onto the exterior of these electrodes and to oppose and diminish this tendency I preferably surround each electrode with a spaced, insulated, wire coil 13, parallel and more or less accurately concentric therewith, although the latter point is of comparatively small importance within wide limits. These coils are located with their axes pointing at those points of the container wall which are located in line with the electrodes and at the ends of the filament and hence of comparatively little value as regards light transmission. In Fig. 1, I have shown these coils as sealed to a glass header 14 carried by the leading-in wires. In Fig. 5, I have shown them as carried by a glass header 15 sealed in the press. The operation of these coils depends upon the fact that insulated metallic bodies of this nature, located inside such container, tend to pick up stray electrons until a considerable charge is accumulated, and this charge exhibits the phenomena of repelling the cathode glow and causing it to confine itself inside the electrodes, at least throughout a much larger range of current-densities than otherwise, and of opposing a lateral throwing of electrons, while positively charged bodies are caught or deflected. This arrangement effectually retards the blackening of the bulb interior, especially the lateral portions."

Claim 1 of this patent is as follows: "Apparatus for producing electric light comprising a closed container which is transparent to the rays desired, a pair of leading-in wires sealed in the walls of said container, metallic electrodes connected one to each leading-in wire inside said container, each electrode comprising a hollow cylindrical body having a closed end, the closed end being connected to the leading-in wire and the open end being turned toward the other electrode, a readily ionizable gas at subatmospheric pressure in said container, and a hollow electrostatic shield surrounding each of said electrodes, and spaced therefrom and insulated from said electrodes and from the tube walls and substantially coaxial with said electrodes respectively."

The defendants' devices complained of are neon tubes which depend for illumina-

tion upon gaseous conduction of electricity. These tubes are provided with a mica lining around the electrodes. Plaintiff contends that such mica linings are infringing "electrostatic shields."

The questions of the existence of substantial evidence and of the weight of the evidence on the issue of infringement both raise the question of the equivalency of mica and metal in the field of electrostatics. The patented invention is based on the use of a metal element for the "electrostatic shield." The plaintiff relies on the doctrine of equivalents, and consequently has the burden of proving that mica is the equivalent of metal. Plaintiff's evidence on this issue consisted of demonstrations on its Exhibit 6 which included four gaseous discharge tubes and the oral evidence of one McIlvaine, the patentee. The oral evidence of witness McIlvaine was to the effect that certain factors have a direct influence on the location and intensity of electric discharge from electrodes in a neon tube, and accordingly on sputtering. The evidence did not establish the existence of all of these factors in respect of any one of the tubes of Plaintiff's Exhibit 6. Consequently, the demonstrations were not evidence of equivalency. Witness McIlvaine testified that defendants' mica lining is an infringing "electrostatic shield," but he also said that several seconds are required for a charge uniformly to diffuse over a mica surface. For the mica to function as an "electrostatic shield" there must be a uniform negative charge thereon when the electrode is a cathode. An electrode in a neon tube is a cathode for 1/120th of a second. When the electrode is an anode (the next 1/120th second) the gas is charged intensely positive, with the result that any negative charge on the mica is neutralized. Consequently, witness McIlvaine's testimony that defendants' mica lining is an "electrostatic shield" is at variance with clearly proved physical facts. It cannot be said that there is substantial evidence of the equivalency of mica and metal in the field of electrostatics.

There is no substantial evidence of infringement of Claim 5 of patent No. 2,040,753 because there is no substantial evidence that mica is equivalent to metal. There is no substantial evidence of infringement of Claim 1 of Patent No. 2,060,584 for the same reasons and for the further reason that this claim requires the "elec-

trostatic shield" to be insulated from the tube wall and the mica in defendants' tubes is not insulated from the tube wall but, on the contrary, lies against the tube wall throughout its extent.

When the court considers the questions of equivalency of mica and metal and of infringement from the viewpoint of the motion for a new trial, the court finds the evidence so overwhelmingly against equivalency and infringement that it can not conscientiously render judgment on the verdict. The evidence overwhelmingly establishes that sputtering is not a problem in neon tubes and that the defendants do not use the mica to prevent sputtering. It is interesting to note that plaintiff has failed to prove that the metal wire coils of the patented device are capable of performing the claimed function of confining the discharge to the interior of the electrodes and localizing the deposit of sputtered metal.

On the trial, the plaintiff sought to carry McIlvaine's invention back to a date early in the year 1927, and one of the principal questions in the case was as to the date to which he was entitled,—this for the reason that several applications pertinent on the question of validity of the patents in suit were filed after McIlvaine's claimed date of invention in 1927 and before the filing of his applications on February 3, 1930, and July 16, 1930, respectively. Plaintiff's proofs in respect of the date of invention were of two kinds: First, by way of exhibits, Plaintiff's Exhibits 3 and 5; and, second, oral testimony purporting to identify those exhibits and establish the date of their existence. There was no evidence offered as to date of conception of the invention, and Exhibits 3 and 5 were apparently offered as reductions to practice. Plaintiff's Exhibit 5 is a tube, technically a rectifier, in which one electrode is at all times an anode and the other is at all times a cathode. While alternating current is used on a rectifier (the purpose of which is to change alternating current to direct current) the alternating current passes through the tube in only one direction. This was admitted by plaintiff's witness. Consequently, one electrode is always an anode and the other is always a cathode. The shielding member in this exhibit is around the anode. This was admitted by plaintiff's witness. Sputtering does not and cannot occur at the anode; it occurs only at the cathode. Further,

the shielding member (metal gauze) is in contact both with the electrode and with the tube wall; it is not insulated from either. The invention of the claims in suit is an insulated and isolated shield around the cathode to control sputtering. Plaintiff's Exhibit 5 is not an exemplification of the disclosures of the claims in suit and therefore is not a reduction to practice of the invention.

Plaintiff's Exhibit 3, the other exhibit, was an electric lamp, which was so badly blackened that it was difficult to determine the structure contained therein.

There is no evidence in the record other than the lamp itself and the otherwise uncorroborated assertion of the inventor, Mr. McIvaine, to prove the invention is contained in this lamp; as a matter of fact, the court is not sure at the moment of this writing whether or not the invention is contained in this lamp, but is inclined to think that it is. It may be added that the electric lamp is so badly blackened because of excessive sputtering that it is rather convincing evidence that the invention does not work. For the purposes of these motions, the court is going to assume that the lamp does contain the invention.

Assuming, then, what certainly has not been proved as to one of the exhibits, namely, that the exhibits do contain the invention, there remains the question as to whether there is substantial evidence of the existence of the exhibits prior to the filing dates. The evidence in respect of this matter consists of the testimony of three persons, the inventor, a Mrs. Prevost, and one King.

The testimony of the inventor was that the bulb, Plaintiff's Exhibit 3, was made "about the spring of 1927," although he "could not say definitely." Mrs. Prevost stated that she worked for Mr. McIlvaine in Cleveland in the summer of 1927 and that she "wound some coils for him." She said that she saw "some sun lamps that looked like Plaintiff's Exhibit 3 in the summer of 1927," although on cross-examination she said she could not say that she saw that particular lamp and she could not say she knew what was in it besides tungsten. Referring to the rectifier tube, Plaintiff's Exhibit 5, she stated that she saw that particular tube on Mr. McIlvaine's table "during the summer of 1927." She said that she did not know what was in the tube. Witness King testified that he saw plaintiff's sun lamps "sometime during the fall or winter of 1927-1928," but he could not say that he saw the particular lamp in evidence. The applicable rule is laid down by the Circuit Court of Appeals for the Second Circuit in United Shoe Mach. Co. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264, as follows:

"When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. Brooks v. Sacks [1 Cir.], 81 F. 403; Dey Time Register Co. v. W. H. Bundy Recording Co. [2 Cir.], 178 F. 812; Bearings Co. v. [D. P.] Harris Hardware & Mfg. Co. [2 Cir.], 299 F. 782. It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the burden is the same as the proof necessary to establish a prior use."

And by the Court of Appeals for the Seventh Circuit in Moline Plow Co. v. Rock Island Plow Co., 212 F. 727, 732, as follows: "Where one seeks to carry the date of invention back of the date of an anticipating patent, he assumes the burden of proof, and must establish an earlier date, 'by evidence so cogent as to leave no reasonable doubt in the mind of the court, that the transaction occurred substantially as stated.' Deering v. [Winona] Harvester Works, 155 U.S. 286–301, 15 S.Ct. 118, 39 L.Ed., 153; Columbus Chain Co. v. Standard Chain Co., [6 Cir.], 148 F. 622, 78 C.C.A. 394; [The] Barbed Wire Patent [Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.], 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154; Coffin v. Ogden, 18 Wall. 120–124, 21 L.Ed. 821."

With this and other like cases in mind, the court is of the opinion that it cannot be said that there was substantial evidence of reduction to practice prior to the filing dates in 1930. Even if the court be mistaken in respect of this matter, the court, sitting as a thirteenth juror, cannot put its stamp of approval upon this evidence but would be required to grant a new trial on this ground alone.

On the question of validity, the defendants cite and rely upon eleven patents.

The first patent referred to by the defendants is Claude No. 1,125,476. This patent is prior art to the whole present-day neon tube industry. It shows two facing metallic electrodes (the patent does not show that the electrodes are hollow, but the testimony of plaintiff's and defendants' witnesses establishes that the Claude electrodes were hollow and cylindrical) with lead-in wires disposed within a closed tube which contains inert gas at low pressure. This patent discloses every element of the claims in suit other than the so-called "electrostatic shield." Tubes made under this patent have, of course, had great commercial success. The patents in suit, to be valid, must disclose invention over this patent. The defendants insist that they do not. They argue that if the mica linings of defendants' tubes are "electrostatic shields", then the glass tube walls surrounding the electrodes of the Claude patent likewise are electrostatic shields and would function exactly the same as is contended by plaintiff in behalf of the mica. The defendants say that addition of a mica lining to the Claude tubes would not constitute a patentable advance over the original disclosures without the mica, for the reason that the electrical characteristics of mica and glass are the same. The plaintiff, realizing that it must show that the use of mica in Claude would constitute a patentable advance over a tube without mica, claims that there is a difference in the electrical characteristics of mica and glass. It claims that mica is sufficiently conductive to be equivalent to metal in so far as diffusion of electrons is concerned, but that glass is too conducting, that is, that no charge could be built up on the glass. The court believes the fact to be that both materials are poor conductors and that neither is equivalent to metal. Tables showing the physical and electrical characteristics of materials show that the conducting characteristics of mica and glass are exactly the same. The court is of the opinion that the patents in suit do not disclose a patentable difference over Claude.

The defendants cite Greiner No. 1,295,-481. This patent, dated in 1919, on a rectifier, shows, particularly, a cylindrical but not hollow electrode, which is at all times a cathode. This electrode is surrounded by an aluminum shell spaced from the electrode and insulated from the electrode and from the glass tube. Glass posts support the shell in its spaced and insulated position. The patent says that the purpose of the aluminum shell around the negative electrode is to absorb "the excess heat from the electrode, preventing the radiation of heat in any form from the electrode to the wall of the bulb." Greiner does not make the same claim for this structure as is made for the "electrostatic shields" of the patent in suit. However, if the devices of the patent in suit operate as "electrostatic shields," the aluminum shield of Greiner would have so operated, and Greiner is an anticipation even though he did not describe or understand the theory expounded by the patentee in the patents in suit. Walker on Patents, Deller's Ed., pp. 1227-8; In re Smith, 49 App.D.C. 203, 262 F. 717.

Smith Patent No. 1,713,356, like Greiner, relates to a rectifier. Its effective date is March 2, 1926, prior to the earliest date claimed for the patents in suit. This patent also is an anticipation of the "electrostatic shield" around a cathode in a gaseous discharge device. This patent discloses a hollow cylindrical metallic electrode (cathode) surrounded by a shield which is spaced and insulated from the cathode and from the tube wall. Smith says that the purpose of the shield is "to restrict radiation and thereby maintain the cathode at a high temperature." This patent is, in the court's opinion, an anticipation for the same reason that Greiner is an anticipation.

The defendants cite Massolle Patent No. 1,634,201, filed in the year 1922. Massolle discloses an electrode (cathode) supported at its end by a spaced shield of insulating material. One of the electrodes shown in the patent has a conical recess in its discharging end and is thus the equivalent of the hollow electrode of the patents in suit. The shield is spaced from the discharging end of the electrode and insulated therefrom by sections of the shield itself. Massolle states that the shield, spaced from the electrode, confines the glow within the conical recess of the cathode. Therefore, the shielding member performs the same function ascribed to the so-called "electrostatic shields" of the patents in suit, namely, to prevent electric discharge from taking place on the outer surface of the electrode.

The defendants refer to Machlett Patent No. 1,689,146, filed October 20, 1926, prior to any date claimed by the plaintiff. Mach-

lett discloses a neon tube having at its ends two hollow electrodes. The particular invention claimed is in the using of an electro-positive alkali metal, such as metallic caesium, which is deposited upon the tube walls somewhat in advance of each electrode. Machlett claims that such use of metallic caesium reduces sputtering and affects the conductive characteristics of the gaseous column, with the result that there is a more efficient use of gaseous conduction for illuminating purposes. Although the patent is silent on this point, the layer of metallic caesium is subject to the same electrical influences as are the metallic wire coils of the patents in suit. Consequently, a negative charge would be built up on the layer of caesium, exactly as is claimed for the metallic wire coils of the patent, and such charge would have exactly the same influence on the discharge from the electrode, assuming, of course, that a sufficient charge could be built up in a neon tube. In the court's opinion, the claims in suit are completely anticipated by this Machlett patent.

Miller Patent No. 1,775,685 is cited by the defendants against both patents in suit, and was cited by the Patent Office against claim 5 of the first patent in suit. The effective date of this Miller patent is October 31, 1928. It is significant that McIlvaine accepted this patent as a reference, that is, he did not, in the Patent Office, attempt to carry his date back beyond October 31, 1928, by means of an affidavit and showing under Patent Office Rule 75. The defendants contend that because of this failure McIlvaine and the plaintiff are estopped now to contend that Miller should not be considered. Miller discloses a small electrode which is subject to excess sputtering. Miller met this problem by placing a metallic shield outside the glass tube around the electrode. The disclosure differs from the patent in suit only in that a charge is maintained upon the shield by an electrical connection to the lead-in wires. Nevertheless, the Miller shield is said to be an electrostatic shield and is intended to perform exactly the same function as are the "electrostatic shields" of the patents in suit. As has been stated, during the Patent Office prosecution of claim 5 of the first patent in suit, the Patent Office rejected the claim in view of Miller. McIlvaine then amended the claim to define his "electrostatic shield" as "positioned within the container," and the Examiner

thereupon made no further mention of the Miller Patent and allowed the claim. The patentee, McIlvaine, testified on the trial that it made no difference whether the shield was on the outside or the inside of the tube, that its function as an "electrostatic shield" would be performed either way. The court is of the opinion that "electrostatic shields" of the patents in suit do not disclose invention over Miller, a reference which was accepted by the applicant during prosecution. Every element of the claims in suit is found in Miller.

The defendants cited British Patent No. 181,675 of April 5, 1923. It relates to a lamp in which a positive column discharge is produced between two fixed electrodes in an atmosphere of inert gas, exactly as is the device of the patents in suit. The electrodes are: "arranged in a cage, e. g. in the shape of a wide helix as indicated in the drawing at 6. The material disseminated from the electrodes cannot then be deposited on the bulb and the useful life of the tube is thereby lengthened."

The wire coil of this British patent is spaced from the electrodes and insulated from the electrodes and from the tube wall in exactly the same manner as the wire coils of the patents in suit. The stated object of the wire coil of this British patent is to avoid blackening of the bulb by sputtering, the same as in the patents in suit. This patent was cited by the Patent Office against the "electrostatic shields." The court is of the opinion that this British patent shows exactly the same structure as the claims in suit, except that the electrodes are not hollow. The objects sought and the results obtained in both cases are the same. In the court's opinion, this British patent is an anticipation.

The defendants also rely on Hendry Patent No. 1,858,737, which carries an effective date of April 4, 1927. There is absolutely no evidence in the case that plaintiff is entitled to a date before April 4, 1927. Hendry shows a metallic cylindrical electrode, having its discharging end hollowed out. Surrounding the electrode and spaced from its discharging hollow end is a shield or shell of insulating material. The portion of the shield or shell disposed about the discharging end of the electrode is spaced from the electrode and from the tube wall and is insulated from the electrode by portions of the shell, which is insulating material. Hendry claims for the

shields, shown in his patent, the same functions claimed for the invention of the patents in suit. He claims that the barrier takes on a positive charge which will act to repel positive particles having a tendency to travel toward the lead-in wires. Hendry had a different theory from McIlvaine, but they claim like purposes, objects and results. In the court's opinion, this Hendry patent anticipates the "electrostatic shields" of the patents in suit.

Reference was also made to Hendry patent No. 1,845,837, filed December 30, 1927. There Hendry shows a metal shield spaced and insulated from a hollow electrode in a neon tube. In the court's opinion, this patent also anticipates the disclosures of the patents in suit.

The defendants cite Hyde No. 1,860,419, which was issued May 31, 1932, on an application filed July 6, 1929. It was co-pending with the applications for the patents in suit. Hyde discloses a hollow cylindrical metal electrode in a neon tube. Sheets of mica or other insulating materials are wrapped around the electrodes and the tube walls. The only difference between the complained of devices and the drawing of this Hyde patent is that in the complained of devices the mica does not completely fill the space intervening between the electrodes and the tube walls. Claim 1 of Hyde reads directly on the complained of devices. It calls for "a sheath of mica surrounding said electrode and interposed between said electrode and the adjacent walls of said envelope." If the patentee McIlvaine intended his claims to have such scope he was under a duty to have copied claim 1 of Hyde for interference purposes and to contest priority of invention in interference proceedings. The Hyde patent issued some four years before the issuance of the patents in suit. In the court's opinion, it anticipates the disclosures of the patents in suit.

Reference is made to Woolrich Patent No. 2,020,393, issued November 12, 1935, on an application filed June 6, 1929. This application was co-pending with the applications on which the patents in suit issued. Woolrich discloses a hollow cup-shaped metallic electrode surrounded by a wire coil, which wire coil is spaced from the electrode and is insulated therefrom and from the tube wall, exactly as are the wire coils of the patents in suit. Woolrich describes the operation of his wire coils in terms of electric theory, which differs but slightly from McIlvaine's description. The function performed by Woolrich's wire coils is described to be the same as the function performed by the "electrostatic shields" of the patents in suit. In the court's opinion, Woolrich anticipated the disclosures of the patents in suit.

The defendants cite Jones Patent No. 2,016,437, issued October 8, 1935, on an application filed September 5, 1928. This application was co-pending with the applications upon which were issued the patents in suit. Jones discloses an electrostatic shield surrounding a rod-like electrode. He states, however, that while a rod-like electrode is shown, it is possible that a tubular electrode may be employed, but that it is essential that its diameter shall be less than the diameter of the shielding tube. Consequently, it is within the disclosure of Jones to use a hollow cylindrical electrode surrounded by a spaced metallic shielding element. The object of Jones was to solve the sputter problem by preventing sputtered metal from entrapping gas molecules. The court is of the opinion that the metal shield of Jones is an "electrostatic shield", and that Jones anticipates the patents in suit.

Plaintiff's case of validity is supported only by the presumption of validity which follows the grant of a patent. Only two of the references above referred to were considered by the Patent Office against the claims in suit. Most of the above mentioned patents deal with neon tubes. Apparently the neon tube art was not thoroughly investigated by the Patent Office in connection with its consideration of the claims of the patents in suit.

On the motion for a judgment notwithstanding the verdicts, the question which presents itself is whether the presumption of validity arising from the issuance of the patents amounts to substantial evidence in the face of this large amount of prior art to which the defendants call the court's attention and which the court believes to be pertinent. It seems to the court that, under some circumstances, the word "substantial" when applied to the evidence must be a relative term. In the case at bar, if the defendants had introduced no prior art, other than that considered by the Patent Office, the court is inclined to think that it would be held that the presumption of validity arising from the issuance of the patent might be considered substantial evidence but where, as

actually happened in the case at bar, the plaintiff introduced its patents and relies upon the presumption of validity growing out of the issuance of the patents and the defendants introduced a large amount of pertinent prior art, which was not considered by the Patent Office, the court thinks that it must be held that there was no substantial evidence of validity introduced.

The court holds that there was no substantial evidence of validity before the jury and that, accordingly, the motion for judgment notwithstanding the verdicts must be granted.

On the question of validity, from the viewpoint of the motion for new trial, the court is clearly of the opinion that the overwhelming amount of pertinent prior art requires the verdict of the jury to be overturned on this issue. The fact is that the conscience of the court will not permit it to put its stamp of approval upon a verdict which holds the patents in suit to be valid.

 The defendants made two contentions under the heading of "double patenting." They contend, first, that claim 1 of the second patent in suit is void in view of claim 5 of the first patent granted to the same applicant. In order that this question may be resolved, the court has divided the two claims into component parts as hereinafter set forth:

No. 2,040,753, Claim 5:

Apparatus for producing electric light comprising

(a) a closed container which is transparent to the rays desired,

(b) a pair of spaced hollow metallic bodies located inside said container having open ends turned toward each other, metallic leading-in wires connected to said bodies,

(c) a readily ionizable gas at sub-atmospheric pressure in said container, and

(d) electrostatic shields surrounding said bodies and spaced therefrom and positioned within the container to receive and maintain a negative charge whereby the cathode glow is confined inside said electrodes.

No. 2,060,584, Claim 1:

Apparatus for producing electric light comprising

(a) a closed container which is transparent to the rays desired,

(b) a pair of leading-in wires sealed in the walls of said container, metallic electrodes connected one to each leading-in wire inside said container, each electrode comprising a hollow cylindrical body having a closed end, the closed end being connected to the leading-in wire and the open end being turned toward the other electrode,

(c) a readily ionizable gas at sub-atmospheric pressure in said container, and

(d) a hollow electrostatic shield surrounding each of said electrodes, and spaced therefrom and insulated from said electrodes and from the tube walls and substantially coaxial with said electrodes respectively.

It will be observed that both claims relate to apparatus for producing electric light and that component parts a and c of claim 5 are exactly the same as component parts a and c of claim 1. The court cannot see any difference between the component part b of claim 5 and the component part b of claim 1, except that identical ideas are expressed by words arranged in different combinations. There is some difference between the component parts d of the two claims but the court does not believe that the difference is substantial. Certain ideas which are in component part d of Claim 5 expressed in the terms of function are in component part d of claim 1 expressed in terms of elements designed to accomplish the function. It follows that the court is of the opinion that claim 5 of the first patent claims the same invention as does claim 1 of the second patent, that there was accordingly double patenting and claim 1 is void. This conclusion would require a judgment for the defendants as to claim 1 of the second patent and would also be a ground for a new trial as to that claim.

The defendants contend that claim 5 of the first patent is void for double patenting, but concede that there is some conflict in the cases as to whether the doctrine of double patenting is applicable as between different inventors. Specifically, the defendants contend that the first patent is invalid for double patenting in view of Hyde No. 1,860,419 and Woolrich No. 2,020,393. It is unnecessary for the court to examine this contention for the reason that the court has decided that Hyde and Woolrich are anticipations.

In conclusion, the court is of the opinion that the motion of the defendants for

judgment notwithstanding the verdicts must be granted. The court is also of the opinion that the motion for a new trial must also be granted for the reason that the court, sitting as a thirteenth juror, cannot put its stamp of approval upon the findings of the jury (1) that the devices of the defendants infringe the patents in suit, (2) that the plaintiff is entitled to dates prior to the filing dates, and (3) that the patents in suit are valid. The court is also strongly inclined to the opinion that it erred in permitting plaintiff's Exhibit 6 to be received in evidence and to be demonstrated in the presence of the jury. This would be a further reason for granting a new trial.

The clerk may enter an order denying plaintiff's motion for judgment on the verdicts and granting defendants' motions for judgment notwithstanding the verdicts and for a new trial, and may enter judgment in favor of the defendants and against the plaintiff for costs.