**UNITED STATES PLYWOOD CORPORATION, Plaintiff,**

v.

**GENERAL PLYWOOD CORPORATION, Defendant.**

**Civ. A. No. 3908.**

United States District Court
W. D. Kentucky,
at Louisville.

March 10, 1964.

Floyd H. Crews, William F. Dudine, Jr., Darby & Darby, Heilman & Heilman, James N. Heilman, New York City, Arthur W. Grafton, Wyatt, Grafton & Sloss, Louisville, Ky., for plaintiff.

John A. Blair, Everett R. Casey, Harness, Dickey & Pierce, Detroit, Mich., Arthur F. Robert, Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

This suit was filed January 12, 1960 by the plaintiff, United States Plywood Corporation, a corporation created under the laws of the State of New York and hereinafter referred to as USP, against the defendant, General Plywood Corporation, a Kentucky corporation hereinafter referred to as GPC. The suit seeks a declaratory judgment as to the validity of United States Letters Patent No. 2,-827,935 issued to George E. Alexander on March 25, 1958 and now owned by defendant GPC under an assignment from the patentee.

The application for the patent in suit was filed on October 10, 1956 and was given Serial No. 615,127. GPC urges that, in effect, the application on which the patent was granted was a continuation in part of a copending earlier application, Serial No. 566,690 filed February 20, 1956.

GPC filed a traverse of the complaint assailing the validity of the Alexander patent and filed two counterclaims. The first counterclaim alleged that USP had infringed the patent and seeks a recovery of damages and an injunction against further infringement. The second counterclaim seeks damages for the use of a wood finishing process by USP, which it obtained in confidence and used in violation thereof, and an injunction against further use of the process.

In amendments to the complaint and to its answer to the counterclaim, USP has charged fraud and misuse of the patent as an additional defense to the charge of patent infringement. USP's principal assault upon the patent in suit is that the process of the patent was discovered and used more than one year prior to patentee's application; that the patent discloses no patentable invention over prior art, and that the patentee Alexander was not the first and original inventor of the process described in the patent. It is also alleged that GPC is estopped from asserting an infringement of its patent by the doctrine of "File Wrapper Estoppel."

The case was tried to the Court beginning December 7, 1962 and concluded February 20, 1963. Oral argument of counsel was heard over a period of five days in August and the case was briefed extensively until the latter part of September, 1963. Counsel for both parties have gone to great pains, trouble, and expense to assist the Court.

In considering the voluminous record in this case the Court is reminded of Judge Wyzanski's statement in his memorandum in Nyyssonen v. Bendix Corp., 137 U.S.P.Q. 853: "This case presents great difficulties to a judge who, like myself, has only the most elementary training in science and mathematics, and has little experience with modern technological developments." It has been necessary to condense a large mass of facts in order to determine the principal questions of validity of the Alexander patent and whether that patent, if valid, has been infringed by USP. The proposed findings of fact and conclusions of law tendered by counsel for the parties, consisting of 187 pages for plaintiff USP and 213 pages for defendant GPC, will be considered as having been offered and rejected by the Court, except where adopted by the Court or where in accord with the Court's findings and conclusions.

## FINDINGS OF FACTS

1. The patent in suit employs the "microseal" process of finishing wood in the white, that is, without the aid of fillers or top coats. The process is for treating a flat wood surface in a straight-through production line operation whereby the treated surface acquires certain desirable properties such as increased hardness, smoothness, and reflectivity and reduced porosity and absorbency. In the broadest sense, the process produces the desired effect by a momentary application of frictionally induced heat coupled with sufficient pressure to compress, pressure smooth, and densify the surface wood without scorching.

According to the patent in suit, the essential frictional heat is generated by non-abrasively buffing the wood surface with a buffing medium having a flexible, yielding, relatively non-abrasive, frictional, heat insulating rubbing surface. The requisite pressure is developed by compressing the buffing medium between a backing member and the wood surface so as to press the buffing medium into a firm and intimate contact with the wood surface. Finally, the buffing speed, pressure, and time of contact are correlatively controlled to produce momentarily a combination of heat and pressure at the point of contact to soften a thin layer of the wood surface while simultaneously compressing that layer.

The apparatus illustrated and described in the patent is a machine similar to a wide belt sander but uses a belt which operates as an "unabrasive" or relatively "non-abrasive" rubbing medium. The belt speed and pressure, as well as the rate of travel of the wood through the point of contact, generates the heat, and the temperature at the surface of the wood approaches but does not attain scorching temperature. The total time of rubbing contact on each point of the wood surface at a feed speed of 90 feet per minute is $\frac{1}{25}$th of a second for a $\frac{3}{4}$ inch band of contact. By limiting the treatment time to a fraction of a second, the process heats and compresses a very thin layer of the wood surface without affecting the underlying wood structure and without scorching the treated surface area. Since the heated layer is very thin, the heat dissipates quickly after contact with the buffing medium thereby permitting the treated surface of the wood to harden and stabilize in its compressed state.

The process was named "microseal" by GPC and microsealed products have been sold by GPC under the trademark "Satin Surface" or "SS." It was recognized that the microseal process increased the gloss of the wood, decreased and made uniform the porosity of the wood, and embedded in the wood the hairs or fibers called "nibs" which existed where abrasives were employed in sanding operations.

Much of the controversy in this case has developed over the sharp issue as to whether there is any densification of the surface of the wood as claimed in the patent in suit. The process claims that the wood contains a material known as lignin, a natural resinous cementing material which when softened by heat causes the heated structure to be easily compressed, and, since the treatment time of heat and pressure is very short, the

frictionally generated heat is confined to a very thin surface that is easily compressed by rubbing pressure. The layer of densification is small because wood is a poor conductor of heat.

The patent is specific that the belt to be used in the process should be flexible, yielding, and relatively non-abrasive, such as canvas or other cloth made of natural or synthetic fibers, providing a flexible, frictional, relatively non-abrasive buffing or rubbing surface composed of non-metallic material. In recommending temperatures, pressures, work feed rate, and other factors to be correlated so as to produce the desired densification without scorching the wood, the patent says: "It is extremely difficult to determine the precise temperatures and pressures which obtain in the practice of this invention with the apparatus in the drawing."

2. *George E. Alexander, inventor of the microseal process,* is a mechanical engineer and was employed by GPC in 1947. After serving in various capacities at GPC plants in other states, he was transferred to Louisville in March, 1954 as production manager and later became vice president in charge of production. At that time, GPC was primarily interested in producing and marketing plywood doors and door skins then in great demand by the building trade. A door skin is the thin outer coat of a door applied to the unfinished solid center or core commercially called a "hollow core."

When Alexander was placed in charge of all production by GPC's president, Henry M. Reed, Jr., he was given the special assignments of developing a method to sand doors on a continuous production line basis and to improve the finish of the doors. Through experiments in sanding and buffing operations conducted in 1954, Alexander conceived the idea which resulted in the process later named "microseal" by GPC. During his studies and experiments, he confided his ideas only to Mr. Reed; Francis A. Bade, Jr., then chief engineer, and Lloyd E. Dimond, a chemist and glue expert, at GPC.

In 1955, Alexander contacted Oliver Judd, who as a representative of Minnesota Mining and Manufacturing Company (hereinafter referred to as 3M) was a frequent caller at the GPC plant because of the latter's purchase of 3M's abrasives. His first inquires to Judd concerned the method of developing the smoothness and finish or burnish of hammer handles. From Judd, Alexander learned that cork belts were obtainable for wide belt sander machines. In its efforts to obtain a wide belt sander that could be used to sand and finish its doors in accordance with Alexander's ideas, GPC conducted experiments at Mattison Machine Company's plant in Wisconsin in September, 1954 with unsatisfactory results. In December, 1954, GPC permitted Timesavers, Inc., to give a public demonstration of its wide belt machine, which was also unsuccessful because the contact roll, like that on the Mattison machine, was too hard and the machine was not wide enough for GPC's doors. The president of Timesavers, Inc., agreed to make a 38-inch wide belt sanding machine with a soft contact roll. A wide belt machine with a soft contact roll was completed by Wicklander Machine Co., for Timesavers, Inc., about April 1, 1955, in compliance with GPC's order placed with Timesavers.

On April 7, 1955, Alexander flew to Chicago and witnessed the operation of the machine at Wicklander's plant in the successful sanding of two hundred doors furnished by GPC for the test. He approved the machine for delivery to GPC and verbally ordered additional machines. Judd traveled with Alexander on his trip to and from Chicago but did not remain with him during the entire course of the experiment. On the return flight to Louisville they occupied adjoining seats and Alexander explained his ideas and described his buffing experiments to Judd. According to Alexander, he asked Judd to obtain a 38-inch wide cork belt for use on the machine purchased by GPC and Judd agreed to obtain the belt but later advised there would be a delay because cork belt material came in 24-inch widths and it would take some time to get a special order for a 38-inch wide belt.

The wide belt sander was delivered to GPC on May 11, 1955, but delivery of the cork belt to be used on the machine was not obtained until July 7, 1955. In the meantime, the officers of GPC became anxious to observe the results obtained by polishing plywood with a cork belt and Judd offered to conduct a trial on a smaller Timesavers machine at the Reynolds Metals Company plant in Louisville. Alexander accepted Judd's offer in reliance upon the fact that, since GPC was a customer of Judd and his employer, Judd was required to keep in confidence the information disclosed to him by Alexander and obtained in the experiment. Judd made the experiment May 18, 1955, with material furnished him by Alexander and obtained the results which were developed into GPC's microseal process. An application for patent was filed by Alexander on February 20, 1956.

Without disclosing his intention to do so, Judd filed an application for patent in March, 1956. October 9, 1956, Judd's application was granted and United States Letters Patent No. 2,765,598 issued to Judd's employer and assignee, 3M. Then a dispute arose between GPC and 3M as to who was the inventor of the microseal process. By agreement, Alexander and Judd were examined separately by deposition early in 1959, which resulted in the execution of a contract and the dedication of the Judd patent to the public with an agreement on the part of 3M not to contest the validity of the Alexander patent applied for October 10, 1956 and issued March 25, 1958.

3. When the Judd patent was granted October 9, 1956, Alexander's application filed February 20, 1956 was denied by the Examiner in the Patent Office, and an appeal was prosecuted to the Board of Patent Appeals. September 30, 1957, the Board reversed the decision of the Examiner and held that none of the references relied upon by the Examiner taught any claimed process or principle of operation which could be suggestive of the process and operation taught in the Alexander application. Alexander's second application had been filed prior to the Board's decision and had been referred to as "in effect, a renewal of the first application." All of the claims in the first application were reinstated by the decision and were added to and made a part of the claims in the second application. Claim No. 19 in the first application became Claim No. 11 in the second application and reads as follows:

"The method of providing a substantially flat wood surface with a glossy and relatively non-porous finish comprising: nonabrasively buffing the surface with a buffing medium having a flexible yielding relatively nonabrasive frictional heat insulating rubbing surface moving at a predetermined buffing speed, compressing the buffing medium between a backing member and said wood surface to press the buffing medium into firm and intimate contact with said surface; and correlatively controlling the buffing speed, pressure and time to compress, pressure smooth and densify the surface wood without scorching."

4. The Constitution of the United States, art. 1, Section 8, Clause 8, empowers the Congress to grant exclusive rights to authors and inventors in promotion of the progress of science and the useful arts. The granting of patents on useful new and novel processes has contributed no small part to the store of patents. Where a patent is scrutinized over a long period of time through tests of the Patent Office, there is an added element to the presumption of validity which attaches to all patents under the provisions of Section 282 of Title 35 United States Code, which provide, in part: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

It is most significant in this case that neither the Patent Office nor the Board of Appeals ever made any reference to the Judd patent, ever mentioned that it would or could constitute an interference to Alexander's application, or ever required or suggested that Alexander

amend any claims to avoid the Judd patent. By amendments, Alexander eliminated from his application any statement that his process involved the application of light pressure upon the wood. This has distinguished his process from that described in the Judd patent. In addition, Judd's patent does not describe his process as depending upon the proper coordination of feed speed, frictional heat, and ultimate compression or densification of the treated portion of the wood.

■ The Court finds that the Alexander patent involves a process distinguishable from the process claimed in Judd's patent and feels that this finding is reinforced by the failure of the Patent Office to mention the Judd patent at any time as a reference in its consideration of the Alexander application.

5. The foregoing determination that the process of the Alexander patent is distinguishable from that of the Judd patent practically disposes of USP's argument that Alexander's patent became invalid by the doctrine of "File Wrapper Estoppel." This doctrine hinges upon USP's contention that Alexander, having failed to contest an interference proceeding with Judd in the Patent Office, must concede the Judd patent as conclusive and is estopped to contend otherwise. Such contention presupposes that the process described in the Judd patent and the Alexander patent are the same.

A reading of Alexander's file wrapper, a review of the testimony heard at the trial, the limited benefit derived by the Court from witnessing demonstrations at the plants of the parties to this litigation, and the scrutiny Alexander's applications experienced in the Patent Office, have convinced the Court that his process is an entirely different process from that patented to Judd. Judd did not consider the densification or compression of the wood, did not employ the heat or pressure necessary to produce the so-called compression or densification, and did not provide for the proper coordination of the factors employed by Alexander and set out with particularity in his description of the process and in the claims of his patent.

USP concedes that if the applications of Alexander and Judd embodied separate processes there is no file wrapper estoppel. It is upon the contention that the processes are different that USP mainly bottoms its argument that it has not infringed.

To the Court, the Alexander patent clearly contemplates the use of buffing belts that are non-abrasive or relatively non-abrasive and of non-metallic material. In fact, Alexander expresses a preference for the use of "a surface treating belt of the type having a cork surface" in his description of the process in his patent. I think this distinction is much more clearly set forth in the Alexander patent than in the Judd patent.

6. The Court has determined that all of the evidence from which infringement by USP could be inferred involves its use of 8/0, 9/0, and 10/0 abrasives or sandpaper in treating wood surfaces. There is no proof that USP was using cork or non-metallic abrasives in any of the accused operations; hence, there is no foundation upon which an infringement could be based.

Counsel for GPC said in his opening statement and repeated several times during the presentation of the case that if USP was sanding in its accused operations then there was no infringement. Since, to the Court, a reading of Alexander's description of his process and the claims of his patent contemplated the use of belts that are originally designed as unabrasive or relatively non-abrasive, it would be illogical to conclude that his patent could be infringed by a belt designed and manufactured as an abrasive instrument but which became relatively non-abrasive because it was worn by use. This was referred to on several occasions during the progress of the trial and none of the witnesses for GPC were ever able to give the Court a satisfactory formula by which it could be told when an 8/0, 9/0, or 10/0 belt ceased to be abrasive and became an infringer of the process in the Alexander patent.

 The Court also concludes that there was no reliable testimony that GPC has unlawfully, fraudulently, or improperly used its patent or granted licenses thereunder which would furnish any foundation for the admeasurement of damages. Nor is there sufficient evidence to support GPC's counterclaim that USP is guilty of a breach of trust.

## CONCLUSIONS OF LAW

It is GPC's contention that the process described in its patent is a valid patentable process as defined by the United States Supreme Court in the case of Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139:

"A process is a mode of treatment of certain materials to produce a given result. It is an act or a series of acts, performed upon the subject-matter, to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art.

"The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely different effect."

The Supreme Court has not given a precise and comprehensive definition of a test by which the legal question of validity of a patent may be determined. The Supreme Court has said, "The standard of patentability is a constitutional standard; and the question of validity of a patent is a question of law." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 155, 71 S.Ct. 127, 132, 95 L.Ed. 162.

 Neither Alexander nor the Patent Office charged or conceded that Alexander's application embodied the same process as that in the Judd patent. The fact that experimentation or the exercise of judgment is necessary to adopt a patented process to a particular material or to obtain the particular results desired does not impair the validity of the patent. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633 (1943); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 7 Cir., 281 F.2d 252 (1960).

 The law places the burden of establishing invalidity of a patent upon the person asserting it. Section 282 of Title 35 United States Code. In this case the long period of time employed by the Patent Office in considering the Alexander applications, and the obstacles and opposition which the applications encountered in the Patent Office add to the presumption of the validity of the patent. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203 (1945).

USP contends that the Alexander patent became invalid under the doctrine of "File Wrapper Estoppel." Its argument in support of this contention merely asserts the principle that if an applicant intends his claims to cover the subject matter of a previously issued patent he is under a duty to copy the claims of the prior patent and contest the priority of invention in interference proceedings. McIlvaine Patent Corp. v. Walgreen Co., D.C.Ill., 44 F.Supp. 530 (1942). Although GPC cannot litigate the issue of priority in this Court, it can and does claim that Alexander's patent describes a process which is not disclosed in the Judd patent, and the Court has determined that the processes of the two patents are not the same.

## CONCLUSION

 The Court concludes in this case (1) that the Alexander patent is valid and GPC is not estopped in the enjoyment of any benefit which a valid patent gives to its owner, and (2) that the proof is inadequate to establish infringement upon the patented process by the plaintiff USP.

A judgment to this effect will be entered and counsel may present judgment in accordance with the findings and conclusions herein made.