**LYLE/CARLSTROM ASSOCIATES, INC., Plaintiff,**

v.

**MANHATTAN STORE INTERIORS, INC. and Albert C. Winters, Defendants.**

No. CV 85–4347.

United States District Court, E.D. New York.

May 28, 1986.

Edward H. Loveman, Melville, N.Y., for plaintiff.

Brumbaugh, Graves, Donohue & Raymond by Peter J. Phillips, James J. Maune and Robert Scheinfeld, New York City, for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Lyle/Carlstrom Associates, Inc. (LCA) commenced this action against defendants Manhattan Stores Interiors, Inc. (MSI) and Albert Winters, seeking a declaratory judgment that defendants' United States Patent No. 4,223,966 (the '966 patent) is invalid.[1] 28 U.S.C. § 2201. MSI contends that the patent is valid and has asserted a counterclaim, alleging that LCA infringed the '966 patent. After joinder of issue, LCA moved for partial summary judgment on the issue of patent invalidity. Briefs and affidavits were submitted and the parties appeared for oral argument before the Court, at which time decision was reserved. For the reasons stated below, the Court concludes that the '966 patent is invalid and, therefore, LCA's motion for partial summary judgment is granted and defendant's counterclaim is dismissed.

## BACKGROUND

### A. The '966 Patent

Albert Winters, the patentee, has been the president of MSI since at least 1960, and on June 1, 1979, he assigned all of his rights in the '966 patent to MSI. He applied to the United States Patent and Trademark Office (PTO) and on September 23, 1980 Winters was issued United States Patent No. 4,223,966. The '966 patent, which contains six claims,[2] describes a free-standing, adjustable glass display case that can be readily assembled and disassembled. More specifically, the '966 patent consists of four glass plates that are joined at their edges to form a rectangular box. Two of the plates stand horizontally. The other two glass plates stand vertically. Each plate has two rows of holes extending along the side of the plate. The plates are held together at their edges by resilient, L-shaped clips. The arms of the clips are U-shaped and slide over the edge of the plate, holding the glass plates together by frictional engagement. The '966 patent provides for a vertical glass divider, also with two rows of holes from the top to bottom. The divider plate is secured to the

---

1. Plaintiff also sought damages from defendants for unfair competition and violations of the Sherman Act, 15 U.S.C. §§ 1, 2. Defendants moved to dismiss these claims. *See Lyle Carlstrom Associates, Inc. v. Manhattan Stores, Inc. and Albert Winters,* 635 F.Supp. 1371 (E.D.N.Y.1986). Those issues, which were severed from the patent claims, are not before the Court on this motion.

2. Of the '966 patent's six claims, two (Nos. 1 and 4) are independent claims. The other four claims (Nos. 2, 3, 5 & 6) are dependent. Nos. 2 and 3 are dependent from No. 1; Nos. 5 and 6 are dependent from No. 4. The claims are described fully in an Appendix to this Order.

two horizontal plates by a stiff plastic U-shaped clamp. The clamp fits over the edge of the divider and a screw is placed through one of the holes in the top or bottom plate and into the head of the clamp. By loosening and inserting the clamps through another pair of holes in the horizontal plates, the divider plate can be repositioned from side to side.

In a similar fashion, the '966 patent provides for glass shelves, which are parallel to the top and bottom plates and secured to the vertical plates by the same stiff plastic U-shaped clamps. As with the vertical divider plate, the clamps fit over the edge of the shelves and are held in place by screws placed through the row of holes in the vertical plates and into the head of the clamps. This allows the shelves to be readjusted up or down. The '966 patent also provides for U-shaped clamps with screws, so that two shelves can be placed at the same level. Furthermore, the entire case has a glass back plate, secured to the two horizontal and two vertical plates by the previously-mentioned L-shaped clips. The '966 patent also provides that these L-shaped clips can secure a second display case of similar design to the back plate of the first case. Finally, the '966 patent describes other frictionally engaging plastic clips with either two, three or four U-shaped arms to join various top, side, and back plates together.

### B. The Reissue Application

In March 1984, MSI sought a re-issue patent. A disclosure statement was filed and on July 10, 1984, defendant's attorney conducted an interview with an examiner of the PTO. Five weeks later, on August 17, the PTO examiner called defendant's attorney to inform him that the re-issue application would be rejected in light of two British patents. Defendant's attorney requested an adjournment of the interview and one month later, on September 12, 1984, he notified the PTO that the re-issue application was being abandoned. The PTO never formally rejected the re-issue application although it is clear that if the re-issue application had not been abandoned, it would have been rejected by the PTO.

### C. Infringement Litigation by MSI

In the course of this litigation, it has come to the Court's attention that MSI has commenced at least three lawsuits to enjoin infringement of the '966 patent. Two of the actions were settled and subsequently terminated. Neither action involved LCA. One of the settlement agreements is under seal. The other agreement, which has been attached to defendants' moving papers as an exhibit, indicates that a defendant in one of these lawsuits agreed not to make, sell, or display its own adjustable display case, unless the '966 patent is declared invalid. In the third action MSI sued LCA in the United States District Court for the Southern District of New York. LCA moved to dismiss for improper venue, but the action was discontinued by MSI before a decision was rendered.

### D. Commercial Success and Copying

Defendants also allege that the '966 patent has met with extraordinary commercial success. In an affidavit, Winters states that MSI's sales in glass display cases increased ten-fold, from $500,000 to $5,000,000, following the introduction of a glass display case based on the '966 patent. Winters admits that separate records are not kept, but maintains that a large part of the increased volume is due to his invention. He states further that glass display cases based on the invention have attracted considerable customer interest and that MSI's competitors have changed their case design to copy MSI's glass display cases.

### OBVIOUSNESS

LCA contends that the '966 patent is invalid as obvious under 35 U.S.C. § 103 when compared to prior art. LCA has moved for summary judgment on this issue. Aside from the other requirements of the statute, a patent is invalid "if the differences between the subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103. In the landmark case of *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court examined the background of 35 U.S.C. § 103 and outlined a four part inquiry to be followed when a patent is challenged for obviousness. The Court held that:

> While the ultimate question of patent validity is one of law, (citation omitted), the § 103 condition, which is but one of three conditions, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; the differences between the prior art and the claims at issue are to be ascertained; and the level of skill in the pertient art are to be resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness, these inquiries may have some relevancy.

383 U.S. at 17–18, 86 S.Ct. at 694. The Supreme Court has not deviated from this test. *See Sakraida v. AG Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). The *Graham* Court did not expect that the question of "obviousness" would be an easy one to resolve or that results would be uniform, but suggested that this question was no more difficult than issues such as negligence or scienter. 383 U.S. at 18, 86 S.Ct. at 694. The lower federal courts have indeed made a substantial contribution to the question of obviousness, but the definition remains elusive and, in the words of Learned Hand, "misty enough." *Reiner v. I. Leon Co.*, 285 F.2d 501, 504–05 (2d Cir.1960), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

A court may grant a motion for summary judgment if "there exists no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56, Fed.R.Civ.P.; *American Manufacturers Mutual Insurance Company v. American Broadcasting-Paramount Theatres*, 388 F.2d 272, 278–79 (2d Cir.1967). Despite a general reluctance to utilize summary judgment in patent cases, the Second Circuit has approved its use in certain circumstances. *C-Thru Products v. Uniflex, Inc.*, 397 F.2d 952, 955 (2d Cir.1968). Since its creation, the Court of Appeals for the Federal Circuit has affirmed a number of lower court decisions declaring a patent invalid for obviousness on a motion for summary judgment. *See, e.g., Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed.Cir.1985); *Peterson Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1546 (Fed.Cir.1984); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984); *Union Carbide Corp. v. American Can Corp.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed.Cir.1983), *cert. denied*, —— U.S. ——, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985); *Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983).

### A. *Disputed Factual Issues*

In a motion for summary judgment, the moving party bears the burden of demonstrating the absence of all issues of material fact; the evidence is construed favorably to the non-moving party. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). These rules apply equally in patent cases. *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984) (citing *D. L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d at 1146–47; *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 653–54 (Fed.Cir.1984). Conclusory statements or mere denials are insufficient to defeat the motion. The non-moving party must establish an evidentiary conflict by at least a statement of facts set forth in an affidavit by a knowledgeable

affiant. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984). It is "incumbent on the trial judge to look beyond mere denials or arguments with respect to issues of scope and content of prior art, differences between the prior art and the invention in suit, level of skill in the art, or other factual issues." *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1571 (Fed.Cir.1984). Summary judgment should be exercised with caution in patent cases, especially when granting the motion invalidates the patent.[3] *Cooper v. Ford Motor Co.,* 748 F.2d 677 (Fed.Cir.1984); *Powerlock Floors, Inc. v. Robbins Flooring Co.,* 280 F.Supp. 627 (D.Del.1968), *aff'd* 404 F.2d 875 (3d Cir.1968) (per curiam). Nevertheless, when the patented device and the prior art can be readily understood without the aid of expert testimony,[4] when the devices may be understood by persons of ordinary intelligence, when the level of ordinary skill is undisputed, and when the only issue before the Court involves the application of these facts to the question of obviousness, the Court may then advance

to the question of whether a party is entitled to judgment under the law. *C-Thru Products,* 397 F.2d at 955; *Monaplastics, Inc. v. Caldor, Inc.,* 378 F.2d 20 (2d Cir. 1967); *Glagovsky v. Bowcraft Trimming Corp.,* 267 F.2d 479 (1st Cir.1959), *cert. denied,* 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Album Graphics, Inc. v. Ivy Hill Lithograph Corp.,* 378 F.Supp. 705, 707 (S.D.N.Y.1973); *Marvin Glass and Associates v. De Luxe Topper Corp.,* 284 F.Supp. 558 (S.D.N.Y.1967).

Defendants contend that the motion for summary judgment should be denied because of the presence of four issues of disputed fact. First, defendants argue that LCA overstates the extent of the prior art, contending that six patents cited by LCA as prior art are irrelevant to the instant patent.[5] "The scope and content of the prior art may be shown by prior patents, publications describing the prior art, and by affidavits or testimony of persons having knowledge of the prior art." *Dielectric Laboratories v. American Technical*

---

**3.** The Court is aware that in the past, courts have shown hostility to motions for summary judgment in patent cases and that such motions are rarely granted, largely because of the technical nature of the patent and the need for direct and cross-examination of expert witnesses. *See Xerox Corporation v. Dennison Mfg. Co.,* 322 F.Supp. 963, 966–67 (S.D.N.Y.1971). In *Xerox,* then District Judge Mansfield listed a large number of cases in which a motion for summary judgment was denied because of the presence of a disputed issue of fact. 322 F.Supp. at 967 n. 3. Judge Mansfield found that in this Circuit summary judgment was granted in only seven cases between 1956 and 1971. 322 F.Supp. at 966 n. 2.

This Court's own research indicates, however, that since *Xerox,* courts in the Second Circuit have become more amenable to the use of summary judgment in patent cases when the issues are not complex and expert testimony is not necessary. *See, e.g., Ken-Wire & Metal Products, Inc. v. CBS, Inc.,* 338 F.Supp. 624 (S.D.N.Y. 1971), *aff'd* 464 F.2d 1393 (2d Cir.1972) (per curiam). *See also* page 1375 of this Memorandum and Order.

**4.** Parenthetically, the mere fact that expert opinions are before the Court in a motion for summary judgment does not preclude the Court from granting the motion and declaring the

patent invalid for obviousness. *See Dielectric Laboratories v. American Technical Ceramics,* 545 F.Supp. 292, 297 (E.D.N.Y.1982). In this case, however, no expert opinions are before the Court, and therefore the issue is merely whether summary judgment can be granted in their absence.

**5.** The six prior patents cited by LCA, which have been put before the Court in full by defendants, consist of the claims and specifications of:

(1) British Patent No. 1,489,875 (Courtney Pope) describing a knock-down wood and glass display unit;
(2) British Patent No. 758,979 (Levine) describing a shelf supporting clip;
(3) United States Patent No. 3,998,002 (Nathanson) describing clamps for toys or small structures;
(4) United States Patent No. 3,955,510 (Kinik) describing clips for shelving;
(5) United States Patent No. 2,240,729 (von Palmenberg) describing fittings for hinged store display counters; and
(6) French Patent No. 1,064,023 (Wolf) describing an all glass display case with a wooden base.

For a more complete description of these patents, *see* p. 1379–1380 of this Memorandum and Order. LCA has not cited any other material or publications as prior art.

*Ceremics,* 545 F.Supp. 292, 296 (E.D.N.Y. 1982). In this case, the prior art cited by LCA consists only of six prior patents. Neither side contends that any prior art is found anywhere other than in these patents. Although LCA's evidence consisted of excerpts of prior patents, defendants have provided the Court with complete copies of the prior patents, and, therefore, have eliminated any question as to the completeness of the prior patent claims. Defendants make much of the fact that these prior patents are not prior art because unlike the '966 patent, they did not describe an *all*-glass structure. They contend that the '966 patent is novel because until the '966 patent, no one had ever been able to construct glass plates with so many holes. This may be true, but that does not create an issue of fact with respect to whether or not the six patents are prior art.

The Court concludes that the six prior patents are clearly prior art. The text of the claims are before the Court in full. Because both the claims and the patents they describe are non-technical, it is possible for the Court to determine whether they are prior art without the aid of expert testimony. There can be no doubt that they are at least relevant to the inquiry. Four of them (Wolf, Kinik, Nathanson, and von Palmenberg) were disclosed to the PTO by defendants during the initial application. Another, Courtney Pope, was also disclosed to the PTO by defendants, this time during the re-issue application. The sixth, Levine, was cited by the PTO examiner, along with Courtney Pope, as a basis for rejection of the re-issue application.

■ Defendants' argument that these patents are not prior art because they do not describe an all-glass case is unsupported by the evidence before the Court. Wolf describes an all-glass display case and Kinik and Levine refer to glass or transparent cases. Accordingly, the Court is persuaded that the six prior patents are prior art and pertinent to the issue of obviousness. The Court wants to make clear, however, that to say that these patents are

prior art does not mean that there are no differences between the prior art and the '966 patent or that the teachings of the prior art would be obvious to an ordinary observer skilled in the art. At this stage of the inquiry, the Court merely concludes that the six prior patents are prior art.

■ The second factual dispute cited by defendants concerns the teachings of the prior art and the '966 patent. Defendants reject LCA's characterization of both the prior art and the '966 patent and suggest that the inventions should be defined by their claims. Although the construction of a patent claim is a question of law, and therefore reserved for the Court, the difference between the prior art and the patent in suit is a question of fact. *Ebeling v. Pakmor Manufacturing Co.,* 683 F.2d 909, 911 (5th Cir.1982) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966)). The content of the prior art is, however, a known quantity because it is found wholly within the four corners of the six prior patents, which defendants have submitted in their entirety as exhibits. The parties may disagree as to what the '966 patent and the prior patents *mean,* but that does not, in an of itself, create a factual dispute. *Union Carbide,* 724 F.2d at 1571. Defendants contend that the invention of the '966 patent and the scope of the prior art are defined by the language of the claims. Defendants Memorandum at 10. The Court agrees. But the question here is not whether the parties disagree over the teachings of the patents (which they do). The question is whether the Court, as the trier of fact, can determine the teachings without either the aid of expert testimony or benefit of a trial. In view of the non-technical language of the claims and the simplicity of the patents, the Court concludes that it is competent to determine the teachings of the '966 patent and the prior patents from the language of the claims.

Third, defendants argue that there is a factual dispute as to the differences between the prior art and the '966 patent. In support of their argument, defendants

point to the 1984 decision of the Court of Appeals for the Federal Circuit in *Cooper v. Ford Motor Co.*, 748 F.2d 677 (Fed.Cir. 1984). In *Cooper*, the court held that summary judgment was inappropriate where the prior art consisted only of prior patents and there was no expert testimony to explain and interpret the prior art. Similarly, defendants point to the decision of this Court in *Brown v. Trion Industries, Inc.*, 575 F.Supp. 511 (E.D.N.Y.1983) where Judge Glasser denied a motion for summary judgement because of a lack of expert testimony on the teachings of the prior art, even though the device was "fairly simple." 575 F.Supp. at 513.

■ The Court concludes, however, that these cases are neither controlling nor persuasive, because the teachings of the prior art in this case can be discerned without the aid of expert testimony. The '966 patent joins the separate and already well-established concepts of an all-glass display case, adjustable shelves, and the various types of clips and clamps that allow the case to be knocked-down and reassembled. With respect to all-glass display cases, the Court concludes that it can discern, from the language of the prior patents, whether they were invented to solve the problems of on-site assembly and adjustability. For example, although Wolf, the French patent, specifically refers to the use of glass as a construction material in display cases, it was clearly not created as an adjustable display case. With respect to various clips and clamps, the Court also concludes that the teachings of these prior patents can also be discerned without aid to expert testimony. The claims of the prior patents state openly both the purpose for which they were created and the manner in which they are to be applied. For example, Kinik refers specifically to the use of clips as shelving apparatus. Merely because the parties disagree about the teachings of prior art does not create an issue of material fact. *Union Carbide*, 724 F.2d at 1571. The Court concludes, therefore that it can determine the teachings of prior art without resort to expert testimony. *See Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202,

204–06 (7th Cir.1982) (citations omitted); *Monaplastics, Inc. v. Caldor, Inc.*, 378 F.2d 20, 21 (2d Cir.1967); *Rains v. Niaqua*, 406 F.2d 275, 278 (2d Cir.), cert. denied, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969); *Turner v. Montgomery Ward & Co.*, 556 F.Supp. 344, 348 (E.D.N.Y.1982). *See also cf. G.B. Lewis Company v. Gould Products, Inc.*, 436 F.2d 1176 (2d Cir.1971) (Friendly, J.) (summary judgment appropriate in design patent cases because expert testimony will not aid the Court in evaluating non-technical matters of visual impression).

Fourth, defendants argue that the level of ordinary skill is also in dispute. 35 U.S.C. § 103 states that the issue of obviousness turns on whether "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." Defendants contend that the level of ordinary skill in the art is best exemplified by examples of what was designed at the time the invention was made. LCA responds that it is prepared to rest upon the lesser skill of the Court rather than the greater skill of one skilled in the art as the level of ordinary skill. The level of ordinary skill varies according to the complexity of the patent; the person having ordinary skill in the art is neither a layman unversed in the art, *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976), nor a genius but "a problem solver and not the user of the solution," *Omark Industries v. Colonial Tool Co., Inc.*, 672 F.2d 362, 364 (3d Cir.1982), *i.e.*, "the mechanically skilled individual familiar with the design of services in the industry." *Id.* (citing *Systematic Tool & Machine Co. v. Walter Kidde & Co.*, 555 F.2d 342, 349 (3d Cir.1977)).

■ Because this is a motion for summary judgment, the Court assumes that defendants are correct when they say that the level of ordinary skill can be shown by what was designed at the time the invention was made. That does not, however, generate an issue of material fact. First,

examples of what was designed at the time can be found in the six prior patents, which defendants have put before the Court in their entirety. Second, merely because these examples are before the Court does not mean that it is any more difficult for the trier of fact to ascertain the level of ordinary skill. Quite the contrary, after an examination of the '966 patent and the prior patents, the Court concludes that it can determine the level of ordinary skill, and that expert testimony would not be necessary to determine whether or not the '966 patent would be obvious to such a person.

Finally, defendants argue that there is a factual dispute with respect to the commercial success of the '966 patent. This is simply not the case. LCA never disputes the commercial success of the '966 patent, as is demonstrated by defendants' affidavits. LCA merely argues that commercial success is a secondary consideration and, thus, of lesser importance.

Therefore, the Court concludes that there are no issues of material fact that would preclude the Court from turning to the question of whether LCA is entitled to summary judgment as a matter of law.

### B. *Factual Inquiry*

#### 1. *Prior Art*

*Graham v. John Deere* requires that the Court first consider the scope and content of the prior art. As the Court has already noted, the prior art cited by LCA and presented to the Court in its entirety by defendants is found wholly within six prior patents. Four of the prior patents (von Palmenberg, Kinik, Nathanson, and Wolf) are concededly relevant as prior art for the simple reason that they were cited as references in the original patent application. A fifth, Courtney Pope, is also relevant to this inquiry because defendants cited it as a reference in the re-issue application. A sixth patent, Levine, is relevant because it was mentioned by the PTO examiner as prior art in an informal note accompanying the re-issue application. The Court therefore turns to an examination of whether these patents are indeed prior art, and if so, their teachings.

*Courtney Pope*—This British invention relates to a knockdown display case, *i.e.,* one that can be quickly and easily assembled and disassembled, with two wooden end walls, and with at least one of the other walls made of glass. The claim describes a square or rectangular box that can be subdivided by vertical partitions and/or horizontal shelves. The case's capacity for being dismantled and reassembled also allows for adjustable shelves and partitions. The shelves are supported by rails that extend along the wooden walls from the front to the back of the case. A shelf can be shifted up or down by moving it from one level of rails to another. Holes are drilled into but not through the top and side walls of the case to support the shelves or the vertical partition.

*Levine*—This British patent was not cited by defendants as a prior reference, but was brought to defendants' attention as prior art by the PTO examiner. This invention describes a clamp intended for use in supporting glass shelves. The clamp has a single U-shaped or bifurcated arm that goes over the edge of a glass shelf. The other end of the clamp has either a projecting threaded screw or one or more screw-threaded holes, thereby allowing two clamps to be joined together. The Levine patent envisions that the clamps will support two glass shelves in the same plane, perpendicular to each other, or at any other angle. The Levine patent also allows for a single clamp to be secured to a rigid structure as a shelf support.

*Nathanson*—This patent describes a clamping device to be used for grasping flat surfaces. Specifically, the clamp, which can be made of wood, metal, or an inexpensive molded plastic, has two elements: at least one pair of closely-spaced, parallel, flat arms that can frictionally grasp a panel placed between them and a sleeve or tube attached longitudinally to the arms. A pole or peg can be slid through the tube and, when the arms grasp a flat panel, the panel is held next to the pole by the clamp. The patent also envisions that a number of clamps can be slid

over the pole and attached to the flat panel, depending upon the length of the pole and/or the size of the panel. The patent further describes a clamp with two, three, or four pairs of arms, all at right angles to each other, thereby enabling two, three, or four panels to be held at right angles to each other. The patent specification suggests that the clamping device can be used to construct children's toys or small structures, or to support flat panels such as sheet rock and the like.

*Kinik*—This patent describes clamps that both connect shelves to the support walls of a transparent display case and allow the quick assembly or disassembly of display cases and the repositioning of shelves, all without the need of tools or other fastening devices. The clamps are made of a clear stiff material, such as polycarbonate, and it is expected that the display case will also be composed of a transparent material. The clamps enable the display case to be broken down and reassembled in an almost limitless variety of shapes and designs. Specifically, the clamps have a cigar-shaped body of a clear, stiff material with two, three, or four fan-shaped arms extending outward from the body. Each of the arms has a slot, into which the edge of a shelf is inserted. The arms of the clamp are perpendicular to each other. One of the arms fits over the edge of a shelf; the other arm fits over the edge of a support wall. Because the clamps can have two, three, or four arms, the clamps are L-, T-, or X-shaped, respectively, when viewed longitudinally. The clamps have no fasteners and friction between the arms of the clamp and the shelf holds the structure together.

*Von Palmenberg*—In pertinent part, this patent describes fittings or hinges for an all-glass store counter or display case without shelves.

*Wolf*—This French patent describes a display case with shelves composed entirely of glass, using glass both as a support wall and for shelving. This display case cannot be readily disassembled or re-built. Shelves are held in place by brackets, which are themselves bolted to the sides of the glass case by screws drilled through the glass walls of the case. This patent also envisions a median or central divider panel with holes drilled through it. Shelves are secured to the central panel by means of through-wall brackets.

It is clear that the prior art describes a number of different inventions. First, the prior art teaches the concept of a knock-down display case. The Courtney Pope patent indicates that ready dismantling and reassembly of a display case would be helpful to retail merchants. This idea is also expressed in Kinik. Second, the prior art reveals that the use of glass throughout a display case has already been envisioned. Von Palmenberg describes hinges for an all-glass display case; Kinik describes non-fastening clips for an all-glass or transparent display case. Most significantly, Wolf, the 1954 French patent, speaks directly of the advantages to the merchant of an all-glass display case. Wolf incorporates glass in the display case, not only as a "filling-in material in the form of shelves" but specifically as a construction material, thus making use of glass's characteristics of transparency and strength. Wolf eliminates the use of metal or other materials in the construction of the display case, except for a wooden base upon which the entire case rests.

Third, the prior art teaches U-shaped support clamps for shelves. Levine describes a clamp that slips over the edge of a shelf and can be attached to either another similar clamp or a fixed surface by means of a screw and nut. Levine indicates that the screw can either protrude from the head of the clamp, (*i.e.*, away from the shelf surface), or can be inserted into the head of the clamp, (*i.e.*, toward the shelf). Levine also teaches that shelves can be positioned in different planes and at different angles to each other.

Fourth, the prior art teaches holes drilled through glass walls to support shelves. Wolf indicates that holes can be drilled through the side walls of a glass display case and that shelf brackets can be secured

to the inside walls of the display case by means of bolts placed through the holes.

Fifth, the prior art also teaches that flat panels such as glass shelves can be held together by L-, T-, or X-shaped clamps made of a stiff plastic and adhering to the shelves by friction. Both Kinik and Nathanson illustrate this idea. Kinik further describes a clip that could be the sole device for supporting a display case composed solely of various transparent panels. The connectors are reuseable and the display cases can be broken down and reassembled by hand without any tools.

### 2. Differences between the prior art and the claims at issue

■ It is well-established that "the obviousness inquiry does not require that all elements of the patent at issue be revealed in a single prior art reference; rather, multiple references may be combined to determine the scope and content of prior art." *Hodosh v. Block Drug Co.*, 83 Civ. 1110, 226 U.S.P.Q. 645 (D.N.J.1985) (citations omitted), *rev'd on other grounds*, 786 F.2d 1136 (Fed.Cir.1986). Turning to the second factual inquiry required by *Graham*, the Court finds that nearly all of the elements of the '966 patent are found in the prior art. First, the idea of a knockdown case allowing ready dismantling and reassembly had already been described in Courtney Pope and was clearly alluded to in Kinik and possibly in Nathanson. Second, the idea of an all-glass or transparent display case was described in the prior art. Von Palmenberg teaches an all-glass display case without shelves. Wolf describes an all-glass display case with glass shelves, walls, front, back, and top. Kinik teaches the use of clips for a fully transparent display case. Moreover, the concept of transparent shelves is expressed in Levine and the use of transparent construction materials is expressed in Courtney Pope. Third, the use of clamps to support shelves is found in both Kinik and Levine. Levine teaches a clamp that can be affixed to another clamp or a wall by means of a screw. Kinik, and to a degree, Nathanson,

both teach L-, T-, and X-shaped clips to support flat panels such as shelves or to hold walls next to other flat panels. Fourth, Wolf teaches holes drilled through glass to support shelf brackets. These ideas are the essential components of the '966 patent.

Defendants contend that the major difference between the '966 patent and the prior art is that the '966 is the first all-glass display case that can be adjusted without complete disassembly. The '966 patent can also accommodate glass shelves of different sizes and at different heights. As defendants stated in their papers and reiterated at oral argument, the '966 patent is able to achieve this property by the twin rows of holes extending up the vertical glass plates. Defendants contend that at trial they would be prepared to prove that, until the '966 patent, no one had been able previously to drill so many holes in a single sheet of glass. They contend that this innovation, which allowed the production of a glass plate with rows of holes, when combined with the other ideas already expressed, creates a novel, patentable device.

LCA does not contest defendants' allegation that a glass plate with so many holes exceeded prior production capabilities and, in this motion for summary judgment, the Court is willing to accept this assertion as provable despite the absence of any affidavits from defendants on this issue. LCA argues, however, that adjustable shelves with rows of holes are already present in Courtney Pope. After a comparison of the '966 patent and Courtney Pope, it is evident that both patents describe a display case with an adjustable central divider wall. The '966 patent, however, utilizes clamps that protrude through the floor and top of the case; Courtney Pope does not.

Defendants point to a second difference between the '966 patent and Courtney Pope. Although both patents describe a display case with adjustable shelves, the '966 patent describes shelves that are held in place by the same wall-through clamps. By contrast, Courtney Pope's shelves rest on fixed rails or brackets and,

furthermore, the British patent does not employ wall-through clamps such as are found in the '966 patent.

Although there are significant differences between Courtney Pope and the '966 patent with respect to the method of attaching shelves and dividers to the outer walls of the case, these differences are insignificant in view of the teachings of other prior art. For example, Levine describes clamps almost identical to those used in the '966 patent. In addition, although Courtney Pope does not employ the same means as the '966 patent of securing the top, bottom, and side walls into a rectangular frame, the device used in the '966 patent, namely the L-, T-, and X-shaped clips, is found in both Kinik and Nathanson. Furthermore, Wolf describes an all-glass display case with shelves resting on through-wall bolts and brackets.

■ Defendants argue that the Court should examine only the differences between the '966 patent and Courtney Pope, and that the other five prior patents are irrelevant to this inquiry because they were considered during the initial patent application and rejected by the PTO as not suggestive of the Winters application. This argument overlooks Levine, which was not cited during the original patent application, but was cited, along with Courtney Pope, by the PTO examiner as a basis for rejecting the re-issue application. Also, although the prior determinations of the PTO are entitled to great weight, this Court is not bound by the factual determinations of the PTO on the relevance or suggestiveness of the prior art, *Reinke Mfg. Co., Inc. v. Sidney Mfg. Corp.*, 594 F.2d 644 (8th Cir.1979); *Choat v. Rome Industries, Inc.*, 480 F.Supp. 387 (D.Ga.1979).

■ There are many factors to be considered when a Court is deciding whether to adopt or reject the factual and legal determinations of the PTO. By statute, a lawfully issued patent is presumed valid and a patent should not be declared invalid by a trial court unless there is clear and convincing evidence of invalidity. 35 U.S.C. § 282. *Radio Corp. v. Radio Lab-*

*oratories*, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934); *Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452 (Fed.Cir.1984). The presumption of validity is generally deemed to be procedural and not substantive, *Lindemann*, 730 F.2d at 1459 (party seeking invalidity has burden of going forward), although the Court may consider the nature of the proceedings before the PTO when determining the substantive validity of a patent. *Kahn v. Dynamics Corporation of America*, 508 F.2d 939, 942 (2d Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Ansul Co. v. Uniroyal, Inc.*, 301 F.Supp. 273, 280 (S.D.N.Y.1969), *rev'd on other grounds*, 448 F.2d 872 (2d Cir.1971). A Court should attach additional weight to the validity of the patent if it appears that the PTO gave close and careful consideration to the applicable prior art, *Amp Inc. v. Vaco Products Co.*, 280 F.2d 518 (7th Cir. 1960), *cert. denied*, 364 U.S. 921, 81 S.Ct. 286, 5 L.Ed.2d 260 (1960); *Metal Film Co. v. Metlon Corp.*, 316 F.Supp. 96 (S.D.N.Y. 1970), if the PTO proceedings were contested, *CMI Corp. v. Metropolitan Enterprises, Inc.*, 534 F.2d 874 (10th Cir.1976); *Alco Kar Kurb, Inc. v. Ager*, 286 F.2d 931 (3rd Cir.1961), if the PTO proceedings were lengthy, *U.S. Plywood Corp. v. General Plywood Corp.*, 230 F.Supp. 831 (D.Ky. 1964), *aff'd* 370 F.2d 500 (6th Cir.1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967), or if the PTO examined the prior art more than once, such as in the context of a successful re-issue application. *Preemption Devices, Inc. v. Minnesota Mining & Manufacturing*, 559 F.Supp. 1250 (E.D.Pa.1983), *aff'd* 732 F.2d 903 (Fed. Cir.1984).

■ On the other hand, Courts should attach less weight to the PTO's determination of validity or even ignore it entirely if there is evidence that the PTO was overworked and unable to handle its large caseload, *Ansul Co. v. Uniroyal, Inc.*, 301 F.Supp. 273 (S.D.N.Y.1969), was not scrutinizing patent applications carefully, *Atlas Copco Aktiebolag v. Ingersoll-Rand Co.*, 279 F.Supp. 783 (D.N.J.1967), was misled

about the scope and content of prior art, *Kahn v. Dynamics Corporation of America,* 508 F.2d 939 (2d Cir.1974), if the proceedings were unchallenged or non-adversarial, *Mueller v. Campbell,* 68 F.Supp. 464 (D.Ohio 1946), or relevant prior art was not disclosed to the PTO, *Codex Corp. v. Milgo Electronic Corp.,* 717 F.2d 622 (1st Cir. 1983), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984), particularly if the subsequent disclosure of prior art would cause the PTO to reject a re-issue application.

The application of these factors to this case undercuts defendants' argument that the Court should ignore the teachings of the patents considered in the original application. Defendants have not presented any evidence that the PTO proceedings were contested by rival claimants or that the Winters application was granted after lengthy and deliberate consideration by the PTO. On the other hand, there is uncontested evidence that two prior patents, Levine and Courtney Pope, were not cited to the PTO during the original, apparently *ex parte* application. These British patents were disclosed to the PTO during the *ex parte* re-issue application and it appears from one of defendant's own exhibits that, on the basis of this disclosure, the PTO was prepared to reject the re-issue application. Moreover, the Court notes that lawful patents are often declared invalid by the courts. *Graham v. John Deere,* 383 U.S. at 18, 86 S.Ct. at 694.

In short, the Court is not prepared to disregard the teachings of the four prior patents cited by defendants in their original patent application. The PTO's original decision to grant the '966 patent is suspect because once the two British patents were disclosed, the PTO indicated that it was prepared to reject the re-issue application. Furthermore, even if this Court were to attach great weight to the PTO's determination that the '966 patent is valid, then the Court would also have to attach great weight to the PTO's subsequent informal advice to defendants' counsel that the re-issue application would be rejected in light of the disclosure of the two British patents.

On one hand, if the Court gives little weight to the PTO's determinations, the Court's *de novo* inquiry should include all six prior patents. On the other hand, if the Court gives great weight to the PTO's determinations, then the Court, like the PTO, should reject the '966 patent on the basis of the two British patents.

 Finally, defendants claim that the '966 patent is different from the prior art because of the adjustability of the shelves conferred on the patent by the holes drilled in the side glass plates and the vertical divider. Although the '966 patent may indicate the first use of rows of holes in a single sheet of glass, the Court is unpersuaded that this production development constitutes a difference between the prior art and the claimed patent. Outside of the prior art cited by LCA, the Court takes judicial notice that rows of holes in wood, steel, or plastic are used widely to afford shelves a degree of adjustability. In fact, the Court is hard pressed to find any adjustable shelves that do not make use of two or perhaps three rows of holes cut into or through the side walls of bookcases, display cases, and the like.

When the '966 patent is compared to the prior art as a whole, the Court concludes that the only difference is that the '966 patent integrated all of these separate ideas for the first time. All-glass display cases such as Wolf and von Palmenberg did not have adjustable shelves and had not yet been designed to incorporate stiff plastic clips or clamps, such as were described in Levine, Kinik, or Nathanson. Similarly, stiff plastic clips or clamps had not yet been used in a knock-down all-glass display case with adjustable shelves, although Kinik, Levine, and Courtney Pope each strongly suggest a fully transparent display case with adjustable shelves. Rows of holes in glass had not yet been used in glass, although they were already widely used in other materials for the specific purpose of making adjustable shelves.

### 3. Level of Ordinary Skill

 Turning to the third *Graham* inquiry, the parties have provided the Court

with little guidance on the level of ordinary skill in the art. As noted earlier, the parties have not clashed about the qualifications of this hypothetical problem-solver. Defendants argue merely that the '966 patent would not be obvious to such a person. LCA's response is that it is entitled to have the legal issue judged by the lesser skill of the Court rather than "one of ordinary skill in the art." Based upon the evidence, the Court concludes that a person possessing ordinary skill in the art would have a background in retail sales or sales management. The evidence does not indicate that the level of ordinary skill would require any advanced education, a professional degree, or scientific or technical training or experience. The Court is therefore prepared to agree with defendants that the level of ordinary skill in the art is best exemplified by what was designed at the time the invention was made. The Court further concludes, however, that expert testimony from a person with that level of skill in the art is not necessary to aid the Court.

### 4. Secondary Considerations

As the Court of Appeals for the Federal Circuit has made clear, a Court should not decide the legal issue of obviousness until it has examined secondary considerations such as commercial success, copying, failure of others, etc. *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1557 (Fed.Cir.1985); *Simmons Fastener Corp. v. Illinois Tool Works*, 739 F.2d 1573, 1574–75 (Fed.Cir.1984). Although evidence of secondary considerations is always relevant and must be considered by the Court, *Stratoflex*, 713 F.2d 1530, 1538–39, the Court concludes that secondary considerations are of little probative value in this case and the evidence points to a finding of obviousness on the basis of the prior art. Their relevance here is slight because there is so little evidence of secondary factors. With respect to commercial success, the '966 patent may have increased MSI's sales but, as Winters admits, there is no factual nexus between the '966 patent and the sales increase. Defendants do not have separate records on sales of glass display cases derived from the '966 patent. It may well be that an increase in sales was due to other factors. *See Revlon Inc. v. Carson Products, Inc.*, 602 F.Supp. 1071, 1096–97 (S.D.N.Y.1985).

Defendants also allege that its competitors began copying the glass cases based on the '966 patent, several infringement actions were commenced by MSI, and defendants in those suits settled in MSI's favor. These facts, which must be construed in defendants' favor, are undeniably relevant. Nevertheless, on the scant record, the Court is reluctant to assign any great weight to these facts. First, defendants have not put forth any evidence to establish the extent or quantity of the copying by MSI's competitors. Second, there is no evidence, other than Winters' affidavit, that the copies were "slavish," *i.e.*, that they resembled, imitated, or were derived from the MSI glass display case. Third, there are no clear inferences about the prospects for success at the trial that can be drawn from the settlement of an infringement action. Settlement may reflect a desire for peace, a plaintiff's superior economic resources, or a defendant's business decision to avoid lengthy and costly litigation. The evidence in this case makes the Court even more reluctant to draw inferences about the merits of the underlying claims from the litigation history of the '966 patent. The terms of the settlement agreement in one action are under seal and therefore unknown to the Court. A second action was discontinued and led to the instant suit by LCA against MSI and Winters for invalidity. In a third action the defendant agreed not to sell or use a particular glass box in the future. Therefore, defendants' evidence of secondary considerations adds little to defendants' argument that the '966 was non-obvious.

### CONCLUSION

The '966 patent presents an instance of what is often, but erroneously, called a "combination" patent. The Court of Appeals for the Federal Circuit has re-

cently clarified the law on combination patents. A device or claim is no less patentable because it integrates or combines prior art. *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed.Cir.1983). To a greater or lesser extent, all patents are combination patents and § 103 does not impose a higher standard of validity or nonobviousness on so-called combination patents. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed.Cir.1983). The patent will not be found invalid merely because the combination lacked "synergy." The standard is the same for all patents, namely, whether they would be obvious to a hypothetical observer with perfect knowledge and an ordinary level of skill in the art. *Stratoflex*, 713 F.2d at 1540. The test is therefore, whether the combination of the old elements would have been new and unobvious. *Egley v. United States*, 576 F.2d 309, 313–14, 317 (Ct.Cl.1978); *MacLaren v. B–I–W Group, Inc.*, 535 F.2d 1367, 1377–78 (2d Cir.1976).

After a careful examination of the evidence, the Court concludes that the '966 patent would have been obvious to a person of ordinary skill in the art. The combination of an all-glass display case, plastic clips and clamps, and adjustable shelves was evident in the prior art. The differences between the totality of the prior art and the '966 patent are too slight to suggest that they would not have been obvious to a person familiar with the prior art.

■ Defendants contend that the all-glass display case is an advancement over the prior art because, until the '966 patent, no one had been able to produce a glass plate with so many holes, which was why wood had always been used. This does not mean, however, that the substitution of glass for wood was novel. The Court is not persuaded that the elimination of all non-glass parts and their substitution with glass or other transparent materials is non-obvious or novel. Substitution of materials will not, in an of itself, create novelty if the same purpose or function could be achieved through the old materials. *Brinkerhoff v. Aloe*, 146 U.S. 515, 13 S.Ct. 221, 36 L.Ed. 1068 (1892); *Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co.*, 110 U.S. 490, 4 S.Ct. 220, 28 L.Ed. 222 (1884). This rule applies even if the substituted material is more satisfactory, cheaper, or more durable. The substitution must bring about a new mode of construction, or new properties or uses of the article that were not obvious and, in effect, make the old material obsolete. *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Leach v. Badger Northland, Inc.*, 385 F.2d 193, 196 (7th Cir.1967). Patentability of an all-glass display case with holes does not rest upon the development of techniques that can put holes in the glass. Nor does it rest upon the possibility that glass is cheaper, more durable, or more attractive than wood. Patentability rests upon whether the use of glass instead of wood created an effect or property that was not obvious when wood was employed.

■ LCA's motion for partial summary judgment is granted and the '966 patent is hereby declared invalid as obvious. 35 U.S.C. § 103. Defendants' counterclaim for infringement is dismissed. The Clerk shall enter partial judgment in favor of LCA in accordance with this Memorandum and Order. Rule 54(b).

SO ORDERED.

## APPENDIX

The six claims of the '966 patent are:

1. An adjustable glass display case, which permits ready assembly and disassembly, comprising:

a frame including four glass plates, a generally horizontally-disposed base plate and two upstanding, spaced-apart side plates disposed generally between said top and bottom plates each of said glass plates having two longitudinally-extending, spaced-apart rows of holes formed therethrough;

first friction-fit means for detachably securing each of said plates of said

frame to the other plates of said frame adjacent thereto;

a back glass plate disposed adjacent to said frame;

a second friction-fit means for detachably securing said back plate to said plates of said frame;

at least one vertical glass divider having an upper and lower edge positioned between and disposed generally parallel to said side plates, said vertical divider having two longitudinally-extending, spaced-apart rows of holes formed therethrough;

means for detachably securing the upper and lower edges of said vertical divider to said top plate and bottom plate, respectively, said means being at least partially retained within at least one of said holes of said top and bottom plates, said means for detachably securing the upper and lower ends of said vertical divider including at least one pair of plastic, resilient first clamping assemblies, each of which comprises a U-shaped clamp having a base with an internally-threaded bore extending therethrough and two spaced-apart arms extending outwardly from said base which are configured and dimensioned for frictionally receiving an edge of said divider therebetween, said clamping assembly also including a screw threadably receivable in said bore of said base of said clamp;

at least one glass shelf having opposite lateral edges disposed between said vertical divider and one of said side plates; and

means for detachably securing the opposite lateral edges of said shelf to one of said side plates and said vertical divider, said means being at least partially retained within at least one of said holes of said side plate and said vertical divider.

2. The display case according to claim 1, wherein said first and second friction-fit means includes a multiplicity of plastic L-shaped, resilient friction clips, each of said clips including two perpendicular, U-shaped arms each of which is configured and dimensioned for frictional engagement with an edge of one of said plates.

3. The display case according to claim 1, additionally including a second frame detachably secured to said back plate.

4. An adjustable glass display case, which permits ready assembly and disassembly, comprising:

a frame including four glass plates, a generally horizontally-disposed base top plate, a generally horizontally-disposed base plate and two upstanding, spaced-apart side plates disposed generally between said top and bottom plates, each of said glass plates having two longitudinally-extending, spaced-apart rows of holes formed therethrough;

first friction-fit means for detachably securing each of said plates of said frame to the other plates of said frame adjacent thereto;

a back glass plate disposed adjacent to said frame;

second friction-fit means for detachably securing said back plate to said plates of said frame;

at least one vertical glass divider having an upper and lower edge, positioned between and disposed generally parallel to said side plates, said vertical divider having two longitudinally-extending, spaced-apart rows of holes formed therethrough;

means for detachably securing the upper and lower edges of said vertical divider to said top plate and bottom plate, respectively, said means being at least partially retained within at least one of said holes of said top and bottom plates;

at least one glass shelf having opposite lateral edges disposed between said vertical divider and one of said side plates, and

means for detachably securing the opposite lateral edges of said shelf to one of said side plates and said vertical divider, said means being at least par-

tially retained within at least one of said holes of said side plate and said vertical divider, said means for detachably securing the opposite lateral edges of said shelf including at lease one pair of plastic resilient second clamping assemblies which includes a first and second U-shaped bracket, each of which has a base and two spaced-apart arms extending outwardly from said base which are configured and dimensional for frictionally receiving an edge of said shelf therebetween, said first U-shaped bracket having an internally-threaded bore extending through the base thereof and said second U-shaped bracket having a threaded stem secured to the base thereof which is configured and dimensioned for threaded engagement with said bore.

5. The display case according to claim 4, wherein said first and second friction-fit means includes a multiplicity of plastic L-shaped, resilient friction clips, each of said clips including two perpendicular, U-shaped arms each of which is configured and dimensioned for frictional engagement with an edge of one of said plates.

6. The display case according to claim 4, additionally including a second frame detachably secured to said back plate.